## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DONALD J. BERNARD** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO: 2-16-CV-1314** |
| | * | |
| **THE SCOTT LITIGATION GROUP** | * | **SECTION: "E"    MAG. "1"** |
| | * | |
| | * | **JURY TRIAL REQUESTED** |

**********************************************

### MEMORANDUM IN OPPOSITION TO MOTION

### FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT**:

Defendant herein, The Scott Litigation Group, has filed a motion for summary judgment. The basis for the defendant's motion is that Donald Bernard's claim for legal fees must be dismissed under Louisiana law relative to the sharing of legal fees, the doctrine of judicial estoppel, and the elements of detrimental reliance. Donald Bernard ("Bernard") opposes the motion for the reasons set forth below.

### SUMMARY OF OPPOSITION

Donald Bernard had an agreement/contract with Wendell Gauthier acting on behalf of the Castano Plantiffs' Litigation Committee, (CPLC) to be a member of the CPLC, which entitled him to a share of the attorney fees.

Donald Bernard was a member of the CPLC by virtue of his agreement/contract with Wendell Gauthier.  Eventually, the CPLC dismissed the Castano Litigation in Federal Court and re-filed it in State Court as the Scott litigation.  Gloria Scott was Donald Bernard's client and was viewed as the ideal plaintiff by members of the Scott litigation group.  Thereafter, the Scott Litigation  Group discontinued communication with Donald Bernard.

Donald Bernard relied on the agreement/contract that he was a member of the Castano Plaintiffs' Litigation Committee and any additional agreement was unnecessary.

Donald Bernard moved to Las Vegas in 1997.  In 2005, he filed a Chapter 7 bankruptcy case. Although he had been included as Counsel of record in the Scott Litigation in State Court, he was not aware of the progress of that litigation after May 23, 1996.  Bernard only became aware of the tobacco litigation in 2015 when he was contacted by Mike Piper.  Bernard was under the impression that his claims for attorneys fees ended with the dismissal of the Castano Federal litigation.  His failure to include these claims in his bankruptcy case were unintentional.  Therefore, judicial estoppel is inapplicable.

Donald Bernard filed a tobacco suit in Federal Court (the Bernard litigation) on behalf of African Americans addicted to tobacco products, which included Gloria Scott.  This suit was filed on May 5, 1994.  In June of 1994 Donald Bernard was approached by Wendell Gauthier for the purpose of dismissing the Bernard litigation.  In return, his clients including Gloria Scott would become plaintiffs in the Castano litigation.  Also Donald Bernard would become a member of the CPLC and would share in any attorney fees.  Relying on Gauthier's promise, Donald Bernard dismissed the Bernard litigation to his eventual detriment.

Summary judgment should be denied due to the genuine issues of material facts that remain in  significant dispute in this matter.

## FACTUAL BACKGROUND

### Attorney-Client Relationship Between Bernard and Scott.

Bernard filed the instant suit for attorney's fees on February 16, 2016 (Doc 1).  As per the verified complaint of Bernard ("Complaint") (Doc 1, pages 2 through 8 of 11), in April 1994, Gloria

2

Scott ("Scott") was a client of Bernard.  Bernard entered into an attorney-client relationship and undertook to act as counsel in the representation of Scott, as well as Ryan M. Bernard, Peter C. Bernard, Edris R. Ford, Marlene Ford and Jesse Trask ("Clients") on their behalf, as well as all other African Americans similarly situated, in a class action on account of their addiction to tobacco products.  Bernard undertook legal and factual research and expended costs in preparing the complaint on behalf of Scott and the other Clients.  On May 5, 1994, the complaint was filed by Bernard with the U.S. District Court for the Eastern District of Louisiana as the matter entitled *Ryan M. Bernard, Peter C. Bernard, Edris R. Ford, Marlene Ford, Gloria Scott, Jesse Trask and All Others Similarly Situated versus The American Tobacco Company, et al.*, proceeding No. 94-14 98 of said court (the "Bernard Litigation"). Bernard's client, Gloria Scott, was a named plaintiff and putative class representative in the Bernard Litigation (Doc 2, p. 6).

**The Castano Class Action and PLC.**

Earlier in 1994, primarily the same attorneys in the Scott Litigation Group had filed the *Diane Castano, et al. v. The American Tobacco Company et al.* as a class action against the tobacco companies and had formed the Castano Plaintiffs' Litigation Committee ("CPLC").  In May of 1994, it was agreed among Bernard and the managing members of the Castano Plaintiffs' Litigation Committee ("CPLC"), that the interests of the Clients and other members of the proposed class of African American smokers in the Bernard Litigation were represented by the class of American smokers in the class-action entitled *Diane Castano, et al. v. The American Tobacco Company et al.*, proceeding No. 94-1044 of the U.S. District Court for the Eastern District of Louisiana (the "Castano Litigation").  On June 1, 1994, Members of the Executive Committee of the Castano PLC ("Executive Committee") represented to Bernard that if Bernard would dismiss the Bernard

3

Litigation, the Clients, including Scott, would be added as class representatives in the Castano Litigation and upon certification as a class-action, Bernard would become a member of the Castano Litigation (Doc 25-2).

Based upon the representations of members of the Executive Committee, Bernard dismissed the Bernard Litigation. Scott came to be designated as a lead putative class representative in the Castano Litigation. Upon the dismissal of the Bernard Litigation, Bernard executed a promissory note in favor of the Castano PLC in the sum of $100,000.00. (Ex. 2 Bernard depo. p.74 ). The CPLC designated Bernard as a member of the CPLC and issued a PLC identification card to Bernard as credentials showing him to be a member of the Castano PLC (Doc 25-3). Bernard immediately began attending meetings and hearings and performing legal and professional services in the Castano Litigation as a member of the CPLC (Ex 2 Bernard depo pg. 71). The Castano Litigation was partially certified as a class action and continued to prosecute the Castano Litigation with Gloria Scott as a representative plaintiff.

The CPLC continued to prosecute the Castano Litigation with Bernard's client Gloria Scott as a representative client in bringing claims against the tobacco companies on behalf of persons addicted to tobacco smoke. Bernard continued to rely upon the representations of members of the Executive Committee that Bernard was a member of the CPLC and to act to represent the Clients in the course of the Castano Litigation, including attending meetings of the CPLC, and traveling at his expense as a member of the CPLC. (Ex. 2, Bernard Depo, pg. 26-27, 34 l. 21-24). At no time did any member of the CPLC advise Bernard that he was not a member of the CPLC. At no time did the CPLC cease treating Gloria Scott as a representative plaintiff in the Castano Litigation.

4

**The Scott Class Action.**

On May 23, 1996, the U.S. Fifth Circuit Court of Appeals vacated the partial class certification in *Castano v. American Tobacco Co.*, 84 F.3d 734 (C.A.5 (La. 1996), with instructions to dismiss the case.  The next day, May 24, 1996, as a result of orders and decisions in the Castano Litigation, the members of the Scott Group, the majority of whose members were also members the CPLC, filed the lawsuit petition in the Civil District Court for the Parish of Orleans ("CDC") entitled *Gloria Scott, et al. vs. The American Tobacco Company, et al.*, No 96-8461 on the docket of said court (the "Scott Litigation") as a class action lawsuit on behalf of Gloria Scott, Deania M. Jackson, and other persons addicted to tobacco smoking. (Doc 1, p. 18).

Bernard appeared in the Scott petition as counsel for the plaintiffs and was also listed in an attachment to the petition as a member of the Plaintiff's Litigation Committee (Doc 25-4, pg. 30, 32).  Bernard's Client, Scott, was named as one of two putative class representatives in the Scott Litigation.  After litigation and appeals, the class in the Scott Litigation was eventually certified as a class action and a jury verdict entered in the Scott Litigation.

After further appeals, on June 27, 2011, the trial court (CDC) adopted the Opinion of the Louisiana Fourth Circuit Court of Appeal and a final judgment entered in the Scott Litigation for $241,540,488 plus legal interest of $37,180,302.55 for a total of $278,720,790.55.  The tobacco companies defendants in the Scott Litigation then unsuccessfully pursued appeals through the federal court system.  (Doc. 1, 22).

On July 26, 2011, the [Scott] Smoking Cessation Trust agreement was executed.  Upon information and belief, on August 1, 2011 the tobacco companies defendants in the Scott Litigation paid  $278,720,790.55 paid into the registry of the CDC.

On May 10, 2012:

(i)     the named tobacco companies (as "Defendants");

(ii)    Deania Jackson and the members of the certified class as ("Plaintiffs"); and

(iii)   "any and all attorneys who have prosecuted the Scott action, including all
        attorneys who seek attorneys' fees and costs and expenses for the prosecution of
        the Scott action, **including members of the Castano Plaintiffs Legal
        Committee** and members of the Scott Litigation Group" (as "Class Counsel"),
        [Emphasis supplied]

entered into a settlement Agreement (the "May 10 Agreement"), a copy of which is attached to
Bernard's petition (Doc. 1, Ex. A) as Exhibit "A" and incorporated herein by reference, for the
payment of $114,275,524 in attorney's fees to the Class Counsel.

       Bernard comes within the definition of "Class Counsel" in the May 10 Agreement,
defined as "any and all attorneys who have prosecuted the Scott action, including all attorneys
who seek attorneys' fees and costs and expenses for the prosecution of the Scott action, including
members of the Castano Plaintiffs Legal Committee and members of the Scott Litigation Group"
and should have been included in the past, present, and future fee distributions among Class
Counsel.

       At all material times herein, Bernard was a joint venturer with the members of the Scott
Group.  They pooled their resources and continued to hold out Bernard's Client, Gloria Scott, as
a representative plaintiff in all litigation and other matters.  As such, each joint venturer was
entitled to a share of all profits.  As a joint venturer or owner, Bernard maintained an ownership
interest in past, present and future profits from these joint ventures.

From mid to late 1996 through the present, the CPLC and Scott Group breached their contractual obligations to Bernard, who was a joint venturer in their endeavors and entitled to share in the fruits thereof. Accordingly, The Scott Group is liable to Bernard for breach of contract for all actions taken and for all efforts to harm his rights to revenues generated by their joint ventureship.

In his Complaint, Bernard alleged that the Scott Trust began disbursing funds on August 1, 2011, continues to disburse at the present time, and will continue to disburse funds until 2022. The Scott Group alleges, in its Amended Answer, that distributions were completed by December 28, 2012.

To date, Bernard has not received any compensation for his representation of Gloria Scott and his participation as a member of the joint venture. The defendants contend that the actual attorney's fees distributed as a result of the Scott Litigation total $103,653,752.00. Bernard does not contest this amount.

The day after the Castano litigation ended, virtually the same group of attorneys filed the Scott litigation in CDC. Notably, included among the plaintiffs' attorneys representing the Scott litigation was Bernard. As stated above, Bernard had been a member of the Castano plaintiffs committee and virtually all of the attorneys from that litigation were counsel of record in the Scott litigation, including Bernard.

## **LAW AND ARGUMENT**

The defendant's motion for summary judgment should be denied because the motion, memorandum, and supporting documents clearly show there are major genuine issues as to material facts in this claim.

**Breach of Contract for a Share in the Legal Fees**

From mid to late 1996 through the present, the CPLC and Scott Group breached their contractual obligations to Bernard by failing to pay him the share of the legal fees he is entitled to under his agreement with Wendell Gauthier. On June 1, 1994, Wendell Gauthier and Bernard entered into an agreement following Bernard's recent conversations with Russ Herman regarding the Bernard lawsuit on behalf of African-American smokers (Doc 25-2).  According to Russ Herman, Bernard's lawsuit was a competing lawsuit which he could not control, so in deciding how to deal with the Bernard lawsuit he stated:

> "I gave my input to Wendell and some others, and Wendell said, "Well get him out. If he'll sign a non-recourse note, let's – you know, let's – let's get him out." "Get him out" meaning get rid of the – what I like to call the "federal Bernard suit". (Ex. 4, Russ Herman depo p.27 L6-11).

The agreement reached between Bernard and Wendell Gauthier states the following:

1. Your class action lawsuit, the *Bernard* suit, will be dismissed without prejudice.

2. One or more of the ***Bernard*** **plaintiffs** will be added as **class representatives** in the *Castano* suit.

3. If the *Castano* suit is **certified** as a class action, you will become a **member of the** ***Castano*** **Plaintiffs' Legal Committee (PLC)**. This gives you the right to designate Mike Piper and your associates for work on the tobacco litigation and their hours turned in with yours to be **paid on an equal basis** with other committee members. [Emphasis supplied]

As the United States Court of Appeals, applying blackletter law and Louisiana law has explained, "[f]our elements are required for a valid contract: (1) the parties must possess the capacity to contract; (2) the parties mutual consent must be freely given; (3) there must be a

certain object for the contract; and (4) the contract must have a lawful purpose." *Wallace v. Shreve Mem'l Library*, 79 F.3d 427, 430 n. 4 (5th Cir. 1996); *see also Miller v. Blattner*, 676 F. Supp. 2d 485, 494 (E.D. La. 2009). From the evidence presented, this June 1, 1994 agreement meets the requirements of a valid contract. The agreement is the result of an exchange where Bernard agreed to dismiss his class action to become a member of the CPLC and remained a member for all relevant times thereafter. The Castano Litigation was certified in 1994 and Bernard became a member of the CPLC and his rights to share in the legal fee which ultimately resulted were vested. The agreement makes no mention that in the event the litigation was decertified that Bernard's rights as a member would terminate at that time. As such, although the Castano litigation was decertified, Bernard's rights to be paid on an equal basis from the legal fee remained when the Castano litigation morphed into the Scott litigation (see doc. 65-12). [The Scott lawsuit was filed the very next day following the decertification of the Castano litigation and involved all of those who were members of the CPLC.] (Doc. 1, p. 18). They pooled their resources and continued to hold out Bernard's Client, Gloria Scott, as a representative plaintiff in all litigation and other matters. [Further, the record shows that Donald Bernard is listed as counsel of record on the Scott petition and his name appears in numerous other pleadings]. (Exhibit 1, Affidavit of Christopher M. Guidroz, p. 17, Exhibit 4, Deposition of Russ Herman, dated June 15, 2017, p. 66, lines 16-22, see also Defendant's statements of undisputed fact 35). During his deposition and in his memo, Russ Herman claimed that Bernard was only listed on those pleadings as a "professional courtesy" and was only removed[1] after failing to respond to the

---

[1]Herman was unable to produce any document or Court Order removing Donald Bernard as counsel of record in the Scott Litigation (Ex. 4 Herman depo. p. 61-66).

letter(s) and/or agreement for the Scott litigation which were supposedly sent to him. (Ex. 4, Russ Herman depo p. 61, L12). However, the appearance of his name on the pleadings in the Scott litigation was not a professional courtesy, rather it was because Bernard was already a PLC member when the litigation was switched from Castano to Scott. As a member of the PLC which continued to pursue the litigation through the Scott lawsuit there was no need to sign an additional agreement and Bernard is entitled to his share in the fee. The breach of contract becomes readily apparent inasmuch as the complaint filed in Civil District Court by the Scott Litigation Group includes the petitioner herein, Donald Bernard, as co-counsel for the plaintiffs therein, which included Donald Bernard's client, Gloria Scott, as a putative representative of the class action.  Russ Herman clearly testified that Wendell Gauthier was the attorney who started this litigation and Wendell Gauthier had the authority to make a binding contract with Don Bernard (Ex. 4, Herman depo, p. 7, l 15-22).

In *McCann v. Todd*, 203 La. 631, 14 So.2d 469 (1943), the Supreme Court recognized that absent an agreement to the contrary, joint venture attorneys are entitled to share equally in compensation.  In such a case, the amount of time and labor furnished by the two attorneys is immaterial to the division of fees.  *McCann*, 14 So.2d at 472.  In *Duer & Taylor v. Blanchard, Walker, O'Quin & Roberts*, 354 So.2d 192 (La. 1978), the Louisiana Supreme Court held that where an attorney retained in a case retains another attorney to assist him, the agreement constitutes a joint venture with respect to the division of the fee.  Each attorney shares the right to participate in the fund resulting from the payment of the fee by the client.  *Id.* at 195.

Bernard testified in his deposition that he and Mike Piper worked with and helped to prepare Gloria Scott for her June 28, 1994 deposition. (Ex. 2, Bernard depo p. 62 L17-22). He

testified to having performed extensive legal research in regard to the disproportionate effect on African-American smokers and tobacco litigation in general. (Ex. 2, Bernard depo p. 31 L5-12). Bernard participated in discussions about the approach that would be used in the case and provided his input that addiction was more prevalent among African-Americans due to the disproportionate impact of tobacco companies targeting their neighborhoods. (Ex. 2, Bernard depo p. 72 L5-16). Ultimately, the theme of the Scott litigation shifted its focus to addiction rather than cancer. Also, he attended the class certification hearing, as well as several meetings held by the PLC at the Windsor Court and traveled to Denver, Colorado for one of these meetings. (Ex. 2, Bernard depo p.71 L13-23). Mike Piper testified that he performed 400 hours of work in connection with the litigation (Ex. 3, Piper depo, p. 47), and while the defendants continue to argue that he never turned in those hours to a central depositary, this issue does not matter because Bernard's agreement with Gautier did not require that hours should be turned in to a central depositary (25-2).  Donald Bernard and Mike Piper already had an agreement in place between themselves to share in the resulting legal fee. (Ex. 2, Bernard depo p.113-114).[3]

Bernard assumed joint responsibility for the representation of Gloria Scott in the Scott litigation because he was a part of the Plaintiff Litigation Committee and testified that he was available, ready, willing and able if he were ever called upon to perform any duties he was asked to perform. (Ex. 2, Bernard depo p.146 L16-19). When the Castano litigation became the Scott litigation the next day following the decertification of Castano, Bernard never received any information and/or documents from the PLC, nor did the PLC ask him to do anything further

_____

[3]Mike Piper's affidavit (attached Exhibit 19) provides a more detailed account of his activities which contributed to this matter.

after he provided his client, Gloria Scott, and the $100,000 promissory note. Therefore, he submits he continued to operate under the premise that he was a member of the PLC representing Gloria Scott in the Scott litigation (Ex. 2, Bernard depo p. 90-91) and as such, his membership in the PLC continued into the Scott litigation, Bernard did not need to sign a new agreement because the June 1, 1994 agreement remained in effect throughout the Scott litigation. As can be seen by Exhibit A to Bernard's Complaint ("The Agreement") (Doc. 1-1 at page 2 of 8), the term "Class Counsel" shall refer to any and all attorneys who have prosecuted the Scott action, including all attorneys who seek attorneys' fees and costs and expenses for the prosecution of the Scott action, including members of the **Castano Plaintiffs Legal Committee** and members of **the Scott Litigation Group**. [Emphasis supplied].  Through the representations of the members of the Castano group, Bernard became a member of the Castano PLC.  Accordingly, it is clear that Bernard falls within the definition of "Class Counsel" according to its definition in the agreement (Doc. 1-1).  It is equally clear that, according to the terms of the agreement, the attorneys' fees to the Class Counsel requested a total $114,275,524.00 from the total fund paid by the defendants. (Doc. 1-1, pg. 3 of 8). Bernard is entitled to a comparable share of the fee received by The Scott Litigation Group because he provided Gloria Scott, who was the ideal plaintiff for this matter, to be the putative class representative. Plaintiff's expert, Michael K. Hurst evaluated and prepared an expert report in this matter and opined that Bernard's claim to a fee of $6,722,089.65 to be both reasonable and customary under these circumstances. (Ex. 18, Expert Report of Michael K. Hurst p.13). Further, the settlement agreement reached in the Scott litigation entitled the Castano PLC to 10% of the fee (see doc. 65-10; 65-12). At the very least, Bernard is entitled to his rightful portion resulting from these funds as he is undisputably a

12

member of the Castano PLC. Contrary to the defendants' assertions, as evidenced by the Gloria Scott, et al complaint (Doc. 25-4), it was unnecessary for Bernard to seek to be appointed to serve as class counsel in the Scott litigation, inasmuch as he was clearly counsel of record in the original complaint filed on behalf of Gloria Scott by the Scott Litigation Group. (See page 30 of Doc. 25-4). It should be pointed out that at page 31 of Doc. 25-4, the petition requests as follows: "Counsel for plaintiffs, and on behalf of all counsel who are members of the Castano Plaintiffs' Legal Committee which was previously approved in *Diane Castano, et al. v. The American Tobacco Company, et al.*" that the plaintiffs' legal committee requested that the address for service be Plaintiffs' Legal Committee, 1100 Poydras Street, 30th Floor, New Orleans, LA 70163. On page 32, the petition lists the Castano Plaintiffs' Legal Committee PLC Members, which includes Donald Bernard, plaintiff herein. In fact, Gloria Scott was so important to the Scott litigation as the class representative that the Scott Group faced a potential major setback when Gloria Scott died during the process of the case.

As Russ Herman testified in his deposition:

"Unfortunately, Gloria, in the process of this case, died. And it was a very hurtful thing. So the question is, under the law, does that mean that we can't go forward, that we need additional class reps?" (Ex. 4, Russ Herman depo p.45 L21-25). He further testified: "But I do remember that there was some concern as to whether we had to substitute a class rep. We decided we didn't have to. The testimony, her testimony, Gloria's, was in; and we were concerned if we substituted a class rep, we'd have to start over again." (Ex. 4, Russ Herman depo p.56 L7-12). And to further drive home just how important Gloria Scott was as the class representative (rather than another person), Mr. Herman stated: "they needed to get the most substantial class rep remuneration that could be awarded, and we had to be sure that they had been engaged. Gloria was more difficult because Gloria had passed away, and we had to deal with her successors in interest, and they had to affirm from their own recollection that Gloria had contracted with the Scott Litigation Group." (Ex. 4, Russ Herman depo p. 55 L17-24).

As such, the Scott litigation was able to commence by including Bernard's client, Gloria Scott, as a named class representative.

The Fifth Circuit applies state law in determining whether attorneys' fees should be awarded in state-based claims. *See U.S. ex rel. Varco Pruden Bldgs. v. Reid & Gary Strickland Co.*, 161 F.3d 915, 919 (5th Cir. 1998). Under Louisiana law, fee awards are allowed only when authorized by contract or statute. *See Steptore v. Masco Constr. Co.*, 643 So.2d 1213, 1218 (La. 1994). Additionally, the Louisiana Supreme Court had held that where an attorney retained in a case employs or procures the employment of another attorney to assist him, the agreement constitutes a joint venture or special partnership with respect to division of the fee. *See e.g. Duer & Taylor v. Blanchard, Walker, O'Quinn and Roberts*, 354 So.2d 192 (La. 1978). When attorneys jointly undertake to represent a client without contracting for a specific division of fees, Louisiana law has held that the attorneys share equally in the fee. *See, Defrancesch v. Hardin*, 510 So.2d 42 (La. App. 1st Cir.), writ denied, 513 So.2d 819 (La. 1987).

The facts of *P & E Boat Rentals, Inc. v. Martzell*, 928 F.2d 662 (5 Cir. 1991) cited by the defendants are distinguishable from the instant case. In *P & E Boat Rentals, Inc. v. Martzell*, an attorney who had neither the time nor resources to handle the complex matter presented in that case and explained to the client that an additional attorney with more experience would be associated to aid in handling the claim. Ultimately, the additional attorney's firm assumed complete responsibility for the case and the original attorney who had minimal participation in litigation was awarded 15% of the fee. The court reasoned the original attorney "vouched for and assumed responsibility for the quality of the work Martzell performed, he monitored developments, early on acted as contact with [the client], and did the work requested of him" and

14

therefore, was entitled to a portion of the net fee. *Id* at 665. Moreover, between the trial and the completion of the appeals process, the client separately executed a contingency fee agreement with the associated attorney's firm. *Id* at 664.

In this case, Gloria Scott never executed a separate written agreement with the Scott Litigation Group. The defendants contend that Gloria Scott was a client of the Scott Litigation Group, but Russ Herman testified that he did not subsequently enter into a contract with Gloria Scott in regard to the Scott litigation. (Ex. 4 Russ Herman depo, p. 53, L 23-25). However, Gloria Scott did execute a written agreement with Bernard pursuant to the Bernard litigation, but unfortunately the contract was lost and/or destroyed in hurricane Katrina. (Ex. 2, Donald Bernard depo, p. 14, L 7-16). Mike Piper actually saw the contingency contract executed by Gloria Scott (Ex. 19 Mike Piper Affidavit). Gloria Scott was always the client of Mr. Bernard, as is evidenced by the fact of the Bernard lawsuit he filed on her behalf. (Ex. 2, Donald Bernard depo, p. 14, L 7-16).

The defendants contend that *Brown v. Seimers*, 726 So.2d 1018 (La. App. 5 Cir. 1999) should control in this matter because an agreement between attorneys to represent a client in a joint venture can cease when one of the attorneys stops prosecuting the case. However, the facts of the present case are clearly distinguishable from those in *Brown*. In *Brown*, the attorney who referred the class action cases already had various complaints pending against him before the Louisiana State Bar Association Disciplinary Board and only did so when it became clear that he would likely lose his license to practice law. *Id* at 2-3. The only action taken by the attorney was to file the petition (which was not served) and subsequently signed up various people as individual claimants. The attorney who assumed responsibility of the claims held meetings with

15

potential class members, executed new agreements with both the existing and new members of

the class, and handled the claim until it settled in 1996. The original attorney voluntarily

surrendered his license to practice law in 1992, but intervened in the 1996 lawsuit for his share of

attorney's fees and was ultimately awarded 15% of the fees by the court.

The facts of the present case are distinguishable inasmuch as Bernard did not surrender

his license to practice law on the basis that there were numerous disciplinary complaints pending

against him before the Bar Association. Rather, Bernard voluntarily surrendered his license to

practice law so that he could continue his education after moving to Nevada. (Ex. 2, Bernard

depo, p. 16 L 22-24). Further, Bernard is the sole reason Gloria Scott was even presented to the

Scott Group as a potential putative class representative and because she met the various

requisites to do so, she ultimately became the face of the successful Scott litigation. This is

evidenced by the fact that when the Scott petition was filed, Donald Bernard was listed on the

petition as counsel of record for the Scott Group. (Doc 39.4). And Bernard neither explicitly

withdrew nor was he discharged as counsel by his client, Gloria Scott, or by the Scott Group.

## **EXPERT REPORTS**

Mr. Bernard is entitled to share in the Scott award under the definition of "Class Counsel"

in the Scott Court's Order of December 20, 2012. The defendants argue that section applies to

those attorneys who "prosecuted" the Scott action, although it specifically mentions the inclusion

of members of the Castano Plaintiffs Legal Committee without regard to whether or not those

members prosecuted the Scott litigation. Thus, this section applies to all of the attorneys entitled

to a share of the Scott award, as it does not exclude members of the Castano PLC and/or Scott

Group. Furthermore, Bernard was a member of the Scott Group by virtue of being a named

16

member of the Castano PLC and continuing said membership when the litigation morphed from Castano to Scott. Moreover, this is evidenced by the fact that Bernard was listed as counsel of record in the Scott petition.

According to the opinion of the defendants' expert, Leslie J. Schiff, Bernard is entitled to no pay on the contention that he performed no work. Schiff argues that Bernard had "no retainer" with Gloria Scott. However, Bernard testified he had executed a written agreement with Gloria Scott but that it was lost in hurricane Katrina. (Ex. 2, Bernard depo, p. 14 L 7-16). To say nothing existed is a stretch to advance the defendants' argument in their favor and does not make sense when considering the fact that Bernard is listed as counsel of record in the Scott petition.

However, if Bernard performed no work in connection with the Scott litigation, how did his client, Gloria Scott, come to be the face of the litigation which is now at issue? Clearly, this was a meaningful legal service performed by Bernard in the Scott litigation. Conversely, the opinion of Bernard's expert, Michael K. Hurst, entitles Bernard to a share of the fee resulting in $6,722,089.65. (Ex. 18 Expert Report of Michael K. Hurst, p.13). Bernard gave up his own litigation to bring his client, Gloria Scott, into the Castano litigation, which ultimately morphed into the Scott litigation. Further, he performed extensive legal research, attended meetings at Windsor Court and even traveled to Denver in connection with the litigation. All the while, Bernard maintains that he was ready, able and willing to do anything and everything that may be asked of him.

The Code of Professional Responsibility (or Rules of Professional Conduct) does not prohibit enforcement of agreement between retained attorney and attorney employed or associated with him to assist in handling case involving contingency fee, and does not require

apportioning of fee on quantum meruit basis. Scurto v. Siegrist, App. 1 Cir.1992, 598 So.2d 507, writ denied 600 So.2d 683.

Accordingly, on the basis of the consideration of Donald Bernard in dismissing the Bernard litigation, in providing Gloria Scott as the ideal putative class member and lead plaintiff, and his contributions, as well as those of Michael Piper, Bernard is entitled to a share of the fee. Clearly, the defendants' motion for Summary Judgment should be denied.

Thus, the relationship between Castano and the Castano PLC and the Scott Litigation Group is readily apparent, as many of the members of the Castano Group comprise the Scott Litigation Group (see doc. 65-12). Obviously, inasmuch as Bernard never received any compensation from the $103,653,752.00 that was allocated as attorneys' fees herein, in spite of the fact that Gloria Scott was his client; in spite of the fact that he was a member of the Castano PLC; and in spite of the fact that he was counsel of record in the *Gloria Scott, et al v. The American Tobacco Company, et al*, State Court Litigation, the motion for summary judgment presents monumental issues of material fact and should be denied.

## JUDICIAL ESTOPPEL

On June 22, 2017, Mr. Bernard's bankruptcy case was reopened by Order of the U.S. Bankruptcy Court for the District of Nevada.  Pursuant to the Order, the Office of the U.S. Trustee appointed Lenard E. Schwartzer as Trustee for the case.  Mr. Schwartzer has now engaged the undersigned counsel to represent the bankruptcy estate of Mr. Bernard in this litigation.

On May 23, 1996, Mr. Bernard understood that the Castano litigation had come to an unsuccessful conclusion with the dismissal of the Castano suit.  (Ex 2, Bernard depo p. 63).

While his name was included on the petition filed in the Scott Litigation (as a Member of the Castaono PLC) and pleadings thereafter, he was not furnished with copies of any pleadings nor was any of the purported correspondence sent to him (Ex. 2 Bernard depo. P. 61-66).  After May 1996, his next communication with anyone involved with the tobacco litigation was in 2015 when he was contacted by Mr. Piper.

In 1997, Mr. Bernard moved to Las Vegas.  In 2005, facing substantial medical bills and other debts, he filed a Chapter 7 case.  Not having thought about the tobacco litigation in nine (9) years, not having any information that the Scott Litigation was ongoing since 1996, nor had the litigation yet been successful, in 2005 he did not schedule any claims associated with it. When Mr. Bernard commenced this litigation on February 15, 2016, he was not aware of the impact of his bankruptcy 11 years earlier.  On May 5, 2017, almost two (2) months after his deposition, defendants sent two interrogatories to Mr. Bernard.  In those interrogatories, the defendants asked him if he previously filed for bankruptcy.

The receipt of the two interrogatories caused Mr. Bernard to reach out to his original bankruptcy counsel, Dorothy Bunce.  She made inquiry with the Office of the U.S. Trustee.  But those communications did not result in any concrete advice.  On May 25, 2017, Mr. Bernard personally contacted Anabel Abad Santos, a paralegal in the Sacramento office of the Office of the U.S. Trustee (the home base for Antonia Darling, the Acting Assistant U.S. Trustee for Las Vegas).  Mr. Bernard followed up with Ms. Santos on June 9, 2017.  On Tuesday, June 13, 2017, Ms. Darling recommended that he hire bankruptcy counsel and reopen his case to administer the assets.

Mr. Bernard then obtained new bankruptcy counsel and on June 21, 2017, Mr. Bernard filed Ex Parte Motion to Reopen Case to administer additional his claim in this litigation.  The case was reopened pursuant to 11 U.S.C. § 350(b).  "A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."

There was no misconduct or bad faith in failing to schedule the claims.  To the contrary, the errors were the result of substantial life changes over a 19-year period.  There was no attempt to conceal the assets.  Mr. Bernard simply did not know when he filed for bankruptcy in 2005 that he had a potential claim to receive attorney's fees dating back to 1994 since Castano had been dismissed in 1996.  Similarly, when he filed his lawsuit in 2016, he did not consider the bankruptcy ten (10) years earlier, nor know the effect on this litigation.  Any mistakes were unintentional.[4]

## JUDICIAL ESTOPPEL IS INAPPLICABLE

Defendants seek to invoke the doctrine of judicial estoppel.  However, judicial estoppel is an "extraordinary remedy" to be invoked in order to stop a "miscarriage of justice"; it is not a "technical defense for litigants seeking to derail potentially meritorious claims." *Ryan Operations G.P. v. Santiam Midwest Lumber Co.*, 81 F.3d 355, 356 (3d Cir. 1996).

Here, when Mr. Bernard was reminded of the bankruptcy in 2017, he immediately sought bankruptcy counsel (Mr. Bernard never practiced bankruptcy law), informed the Office of U.S. Trustee, and filed this motion to reopen his case to administer the claim.  Reopening and

---

[4]See affidavit of Donald Bernard Exhibit 20.

scheduling the asset mitigates against judicial estoppel.  *Ah Quinn v. City of Kauai, Dept. of Trans., 733 F.3d 267* (9th Cir. 2013).

While the aim of judicial estoppel is to protect the integrity of the judicial process, judicial estoppel is not governed by "inflexible prerequisites or an exhaustive formula for determining [its] applicability," and numerous considerations "may inform the doctrine's application in specific factual contexts." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001). Judicial estoppel is an affirmative defense where the party moving for summary judgment "bear[s] the burden of proof at trial and therefore must show that it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007).  To reach the question of whether Mr. Bernard has shown that judicial estoppel does not apply, the defendants must have proven that it does. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The Fifth Circuit requires that a party asserting judicial estoppel show three factors. The third factor that the party asserting must show is (3) the party did not act inadvertently." *Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Tex. Wyo. Drilling, Inc.)*, 647 F.3d 547 (5th Cir. 2011), citing *Superior Crewboats Inc. v. Primary P & I Underwriters (In re Superior Crewboats)*, 374 F.3d 330, 335 (5th Cir. 2004); *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011).

Examples unintentional failures to disclose claims noted at footnote 9 of *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207–08 (5th Cir. 1999) see: *Brassfield v. Jack McLendon Furniture, Inc.,* 953 F.Supp. 1424 (M.D.Ala.1996) (in Chapter 7 case, where claims accrued after filing petition, and where debtor was not aware of claims during bankruptcy, debtor

21

not judicially estopped from asserting unscheduled claims); *Elliott v. ITT Corp.,* 150 B.R. 36 (N.D.Ill.1992) (where debtor was unaware that claim against creditor existed, and amended schedule after discovery of potential claims, judicial estoppel inapplicable); and, *Neptune World Wide Moving, Inc. v. Schneider Moving & Storage Co. (In re Neptune World Wide Moving, Inc.)*, 111 B.R. 457 (Bankr.S.D.N.Y.1990)

Inadvertence is applicable in the case of Mr. Bernard. Quite simply, it would have been impossible for Mr. Bernard to include his claim for fees in the Scott Litigation when he filed for bankruptcy in 2015, as he only knew that the Castano Litigation had been dismissed in 1996.

As Mr. Bernard had not received any communications from the Castano PLC after 1996, he did not know that in 2002 the Members of the Castano PLC circulated a retroactive agreement whereby "the PLC intends to continue to prosecute the causes of action asserted in the Castano Suit in individual state class actions", which agreement, in (Exhibit 10 B (Doc. 65-3 p. 2 of 21)), included the Scott Litigation. As a result, he did not schedule any asset associated with it. Perhaps the most compelling fact supporting that Mr. Bernard was not aware of a claim against the Scott Litigation Group is that the Complaint was not filed until more than three (3) years after the fees in the Scott Litigation were distributed. As a result, the claim in the Complaint for breach of fiduciary duty was dismissed on the basis of prescription (Doc. 50). If Mr. Bernard was aware that he had a claim, and certainly, if Mr. Bernard was aware that fees had been distributed on February 13, 2013, he would not have waited until February 16, 2016 to file his Complaint. When delaying filing a claim for breach of fiduciary duty for over three (3) years could result in the claim being dismissed on the basis of prescription, no one who was aware of the existence of a claim would intentionally wait until it was prescribed to file suit.

When, as in the case of Mr. Bernard, a debtor who lacks knowledge of a claim, the failure to disclose is considered inadvertent.  Nor can there be an intent to mislead when the debtor does not know of the claim.  A debtor cannot either "fail to disclose" or "intend to mislead" when the debtor does know of the claim.

Inadvertence is a question of fact.  Mr. Bernard has pled facts sufficient to show inadvertence on his part in not scheduling the claim, a claim of which he was not aware.  Therefore, under the standards of both the Fifth Circuit and the Ninth Circuit, wherein the bankruptcy is pending, judicial estoppel does not apply.  Application of this affirmative defense as an equitable remedy would, under the facts of this case, be inequitable.

**Detrimental Reliance**

To invoke the doctrine of detrimental reliance, the claimant must prove three elements: (1) a representation by word or conduct, (2) justifiable/reasonable reliance, and (3) a change in position to one's detriment because of the reliance.(Per Kirby, J., with one judge joining and one judge concurring.) *Bains v. Young Men's Christian Ass'n of Greater New Orleans,* App. 4 Cir.2007, 969 So.2d 646, 2006-1423 (La.App. 4 Cir. 10/3/07), writ denied 973 So.2d 727, 2007-2146 (La. 1/7/08).

Under detrimental reliance doctrine, plaintiff is permitted to recover economic harm whenever defendant made representation by word or conduct upon which plaintiff justifiably relied and because of which plaintiff changed his position to his detriment. *Babkow v. Morris Bart, P.L.C.,* App. 4 Cir.1998, 726 So.2d 423, 1998-0256 (La.App. 4 Cir. 12/16/98).

The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. *Suire v.*

*Lafayette City-Parish Consol. Government,* Sup.2005, 907 So.2d 37, 2004-1459, 2004-1460,

2004-1466 (La. 4/1, rehearing denied; *Jackson v. Lare*, App. 2 Cir.2000, 779 So.2d 808, 34,124

(La.App. 2 Cir. 11/1/00); *Babkow v. Morris Bart, P.L.C.,* App. 4 Cir.1998, 726 So.2d 423,

1998-0256 (La.App. 4 Cir. 12/16/98); *Knight v. State*, App. 2 Cir.1998, 718 So.2d 646, 30,902

(La.App. 2 Cir. 9/28/98); *Orr v. Bancroft Bag, Inc.,* App. 2 Cir.1997, 687 So.2d 1068, 29,046

(La.App. 2 Cir. 1/22/97); *Andrus v. Andrus,* App. 3 Cir.1994, 634 So.2d 1254, 1993-856

(La.App. 3 Cir. 3/2/94).

As previously stated, to establish detrimental reliance under Louisiana law, a party must

prove three elements by a preponderance of the evidence: (1) a representation by conduct or

word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the

reliance. *New Orleans City v. Ambac Assur. Corp.,* C.A.5 (La.)2016, 815 F.3d 196.

Donald Bernard could have continued to pursue his *Bernard* lawsuit but chose to have it

dismissed on the reliance that he was a member of the Castano PLC, which became the Scott

litigation. Earlier in 1994, primarily the same attorneys in the Scott Litigation Group filed the

*Diane Castano, et al. v. The American Tobacco Company et al.* as a class action against the

tobacco companies and had formed the Castano Plaintiffs' Litigation Committee ("Castano

PLC").  As previously stated, in May of 1994, it was agreed among Bernard and the managing

members of the Castano Plaintiffs' Litigation Committee ("Castano PLC"), that the interests of

the Clients and other members of the proposed class of African American smokers in the Bernard

Litigation were represented by the class of American smokers in the class-action entitled *Diane*

*Castano, et al. v. The American Tobacco Company et al.*, proceeding No. 94-1044 of the U.S.

District Court for the Eastern District of Louisiana (the "Castano Litigation").  On June 1, 1994,

Members of the Executive Committee of the Castano PLC ("Executive Committee") represented to Bernard that if Bernard would dismiss the Bernard Litigation, the Clients, including Scott, would be added as class representatives in the Castano Litigation and upon certification as a class-action, Bernard would become a member of the Castano Litigation.

Based upon the representations of members of the Executive Committee, Bernard dismissed the Bernard Litigation.  Scott came to be designated as a lead putative class representative in the Castano Litigation.  Upon the dismissal of the Bernard Litigation, Bernard executed a promissory note in favor of the Castano PLC in the sum of $100,000.00.  The Castano PLC designated Bernard as a member of the Castano PLC and issued a PLC identification card to Bernard as credentials showing him to be a member of the Castano PLC.  Bernard immediately began attending meetings and hearings and performing legal and professional services in the Castano Litigation as a member of the Castano PLC.  The Castano Litigation was partially certified as a class action and continued to prosecute the Castano Litigation with Gloria Scott as a representative plaintiff.  The defendants argue that Bernard is not entitled to a fee, relying on Rule 1.5 of the rules of professional responsibility.  However, the cases relied on by defendants are distinguishable in that they deal with attorney fee distribution wherein no contract exists among the attorneys.  Herein, Bernard has an express agreement (Doc 25-2) as the basis for his share of the fee.  Therefore, the defendants argument is without merit.

Bernard continued to rely upon the representations of members of the Executive Committee that Bernard was a member of the CPLC and to act to represent the Clients in the course of the Castano Litigation, including attending meetings of the CPLC, and traveling at his expense as a member of the CPLC (Ex. 2, Don Bernard depo p. 31-35) At no time did any

member of the CPLC advise Bernard that he was not a member of the CPLC.  At no time did the CPLC cease treating Gloria Scott as a representative plaintiff in the Castano Litigation.

Clearly, Bernard was a joint venturer with the members of the Scott Group.  They pooled their resources and continued to hold out Bernard's Client, Gloria Scott, as a representative plaintiff in all litigation and other matters.  As such, each joint venture was entitled to a equal share of all profits.  As a joint venturer, Bernard maintained an ownership interest in past, present and future profits from these joint ventures.  Evidence herein clearly shows that upon dismissal of the Castano Federal Litigation, the Scott Litigation was filed the next day by primarily the same attorneys, who included Donald Bernard as counsel of record and used his client, Gloria Scott, as the lead plaintiff.

Defendants also maintain that because Bernard surrendered his law license in 2002, he cannot be entitled to any fee.  Bernard submits that this is of no moment, inasmuch as when he struck his agreement with Wendell Gauthier in 1994, he was a practicing attorney with a valid license to practice law.  As such, he is entitled to all of the fruits of that contract, which includes a share of the fees.

**Summary Judgment not proper in the case at bar**

Summary judgment is only proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). A dispute is genuine if the issue could be resolved in favor of either party. *See Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986). A fact is material if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  In ruling on a

26

motion for summary judgment, "The Court must indulge every reasonable inference from those facts in favor of the party opposing the motion." *AT&T Co. v. Delta Communications Corp.*, 590 F.2d 100, 101-02 (5th Cir.) *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed. 2[d] 182 (1979).  In order for summary judgment to be granted, "the facts and inferences must point so strongly and overwhelmingly in favor of one party, that the court believes that reasonable men could not arrive at a contrary verdict".  *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969).

Defendants' motion for summary judgment is based on the erroneous assumption that there are no genuine issues of material fact in dispute in the present case. The evidence will show that there are significant material issues of fact in this case, and thus summary judgment is not proper.  If the evidence is viewed in the light most favorable to Bernard, the fact finder could possibly determine that Bernard's contributions to Castano and Scott led to the attorneys fees realized in Scott.  As such, Bernard should be entitled to a share of the fee.

For all of the above and foregoing reasons, plaintiff, Donald Bernard request this Honorable Court to deny the defendants motion for summary judgment.

It is submitted that the following constitutes genuine material facts which are in dispute, precluding summary judgment:

1) Whether Donald J. Bernard's June 1, 1994 agreement (doc 25.2), which undisputedly made him a member of the Castano Plaintiff Litigation Committee entitled him to a share of the fee ultimately recovered by the Scott Litigation Group;

27

2)      Whether or not the members of the Castano Plaintiff Litigation Committee

(including Bernard) became members of the Scott Litigation Group, thus entitling

them to a share of the fee;

3)      The value that the addition of Gloria Scott (who was undisputedly Donald J.

Bernard's client) to the Scott Litigation and the Scott Litigation Group;

4)      Whether or not Donald J. Bernard's lack of knowledge of the progress of the Scott

Litigation precludes judicial estoppel of his claims herein;

5)      Whether or not Donald J. Bernard is entitled to a share of the attorney's fees

obtained in the Scot Litigation resulting from his detrimental reliance on the June

1, 1994 agreement wherein he dismissed his Federal Court lawsuit (*Bernard et al*

*vs. The American Tobacco Company, et al)* proceeding no. 94-1498;

6)      Whether the June 1, 1994 agreement between Donald J. Bernard and the Castano

Plaintiff Litigation Committee constituted a joint venture within the meaning of

*Duer and Taylor v. Blanchard, et al* 3545029192 (LA 1978) and as such, entitles

Donald J. Bernard to an equal share of all legal fees obtained pursuant to the joint

venture.

## <u>CONCLUSION</u>

Given the foregoing, it is readily apparent that Donald Bernard is entitled to a share of the

fee obtained by the Scott Litigation Group.  However, it is equally apparent that substantial

issues of material fact exist.  Therefore, the defendants motion for summary judgment should be

denied.

28

Respectfully submitted by:

/s/ John M. Robin

_____

JOHN M. ROBIN, LA. BAR NO. 11341
600 COVINGTON CENTER
COVINGTON, LOUISIANA 70433
TELEPHONE: 985-893-0370
FAX: 985-893-2511
**johnmrobin@johnmrobinlaw.com**

## CERTIFICATE OF SERVICE

I hereby certify that on the 1[th] day of August, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing, fax, USPS or email to the following:

Robert L. Redfearn                               Maury Herman
Simon, Peragine, Smith & Redfearn, LLP          Stephen J. Herman
1100 Poydras Street, 30th Floor               Herman, Herman & Katz, LLP
New Orleans, LA 70163                            820 O'Keefe Avenue
                                                 New Orleans, LA 70113


I further certified that I mailed the foregoing document and the notice of electronic filing by first class mail to the non-CM/ECF participants.

                          /s/ John M. Robin
                          JOHN M. ROBIN